**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TERRANCE L. NEEDHAM, | CIVIL ACTION 1:14-cv-04402 |
| Plaintiff, | |
| v. | COMPLAINT |
| CAVALRY SPV I, LLC, | JURY TRIAL DEMANDED |
| Defendant. | |

**COMPLAINT FOR RELIEF PURSUANT
TO THE FEDERAL FAIR DEBT COLLECTION PRACTICES ACT**

NOW COMES the Plaintiff, TERRANCE L. NEEDHAM ("Terry"), by and through his attorneys, SULAIMAN LAW GROUP, LTD., complaining of the Defendant, CAVALRY SPV I, LLC, as follows:

**NATURE OF THE ACTION**

1.      Terry brings this action for damages for Defendant's violations of the Fair Debt Collection Practices Act, 15 U.S.C. §1692, et seq. ("FDCPA") and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, et. seq. ("ICFA").

**JURISDICTION AND VENUE**

2.      This action arises under, and is brought pursuant to, the FDCPA. Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §1692k (FDCPA) and 28 U.S.C. §§1331, 1337, as this action arises under the laws of the United States, and supplemental jurisdiction exists for state law claims pursuant to 28 U.S.C. §1367.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §1391; Defendant conducts business in the Northern District of Illinois and all of the events or omissions giving rise to the claim occurred within the Northern District of Illinois.

1

## PARTIES

4.      Terry is a natural person who resides in the Northern District of Illinois and is a "consumer," as defined by the FDCPA, 15 U.S.C. §1692a(3).

### Cavalry SPV I, LLC

5.      Defendant Cavalry SPV I, LLC ("Cavalry") is a limited liability company chartered under Delaware law that transacts business in Illinois. Cavalry's principal place of business is located at 500 Summit Lake Drive, Suite 400, Valhalla, New York 105951. Cavalry's registered agent in Illinois is CT Corporation System, located at 208 South LaSalle Street, Suite 814, Chicago, Illinois 60604.

6.      Cavalry is in the business of taking title or claiming to take title to charged-off debts allegedly owed by consumers and originally owed to others.

7.      Cavalry then seeks to enforce the alleged debts against the consumers through lawsuits.

8.      The mails and telephone system are used in connection with the prosecution of the Cavalry lawsuits.

9.      Cavalry is a "debt collector," as defined by the FDCPA, 15 U.S.C. §1692a(6).

## FACTS SUPPORTING CAUSE OF ACTION

10.      Cavalry has been attempting to collect from Terry a debt alleged to have been originally owned by Bank of America/FIA Card Services, N.A. ("FIA," or "FIA account").[1]

11.      On or about September 6, 2013, Cavalry filed a complaint in the Circuit Court of Will County, Illinois against Terry. The case was captioned *Cavalry SPV I, LLC v. Terrance L. Needham*, case number 2013-SC-5958 ("collection case"). *See* Exhibit A, a true and correct copy of the collection case complaint ("Cavalry's complaint").

---

[1] Calvary does not specify whether William allegedly opened the FIA account with FIA or Bank of America.

12.     In the collection case, Cavalry alleges that it purchased and now owns the FIA account. Cavalry's complaint was unsupported by any documentation. *See* Exhibit A.

13.     On or about October 17, 2013 Calvary filed its Affidavit of Claim with the Clerk of the Circuit Court. *See* Exhibit B, a true and correct copy of Calvary's Affidavit of Claim.

14.     This Affidavit of Claim was made by Eileen Fitzgerald ("Fitzgerald" and "Fitzgerald Affidavit"), a Legal Administrator for Calvary Portfolio Services, LLC, an affiliate of Calvary. *See* Exhibit B at ¶2.

## The Debt Buying Industry

15.     Cavalry is a debt buyer. Debt buying is the practice of purchasing charged-off debts from debt originators, or other debt buyers. These debts are purchased in bulk and are usually credit card debts.

16.     Debts sold by original creditors are typically bundled into portfolios because bundling accounts into portfolios reduces the transactions costs of exchange. *See* Federal Trade Commission, The Structure and Practices of the Debt Buying Industry, January 2013, available at http://www.ftc.gov/reports/structure-practices-debt-buying-industry (last visited March 5, 2014) ("FTC Debt Buyer Report").

17.     When purchased, these bundled account portfolios are transferred via electronic data files that contain only a few data elements from the original account records. When printed out, the electronic evidence of the sale, or data file, consists of one line per debtor.

18.     The typical data file contains the original account number, the name of the consumer, the address of the consumer, the last balance purportedly owed, the date of the last payment, and the date that the account was charged-off. *Id*. at pp. 34-35.

19.     Debt buyers generally do not obtain the original account records (the day-to-day transactions on the account that are generally made at or near the time of each transaction, in the normal course of business) related to the purchased debts.  For most portfolios, buyers do not receive any documents at the time of purchase. Only a small percentage of portfolios include documents such as account statements or the terms and conditions of credit. *Id*. at p. iii.

20.     The data files obtained by debt buyers are not the original account records that were created in the regular course of business by the credit originator—they are created prior to the sale of a portfolio of charged-off debts. They are created for sale to a third party, and are not created in the regular course of servicing the credit card account.

21.     Furthermore, debt sales are typically "as-is," with limited or no ability to obtain additional information from the original creditor; debt sellers generally disclaim the accuracy of the information transferred in the data file. *See* FTC Debt Buyer Report at p. 25.

22.     Where different debt buyers enter into purchase and sale agreements with the same seller, the structure, organization, and phrasing of these agreements are virtually identical. *Id.* at pp. 24-25.

23.     Cavalry relied on the information that it allegedly obtained from FIA (the data file) when it filed the Collection case.

24.     However, Cavalry had absolutely no assurance that the information it received was accurate because, on information and belief, FIA allegedly sold its debts to Cavalry, or its successor in interest, in "as-is" condition.

25.     The information on which Cavalry relied to file the state court action would not be considered satisfactory evidence if submitted to court. A document is not admissible as a

"business record" under Illinois law if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness …" Illinois R. Evid. 803(6).

26.    It is common practice in the industry to purchase debts without obtaining original account information due to the time and cost of obtaining such documentation.

**Pattern and Practice in State Court Collection Actions**

27.    Cavalry routinely files state court collection actions with no more evidence of the debt in question than the single line data file described above.

28.    Cavalry knows that the information on which it relies to file the state court collection actions will not be supported with adequate evidence, yet Cavalry is not willing or not able to obtain such evidence.

29.    Usually when Cavalry files a collection action it obtains a default judgment against the consumer.

30.    Upon information and belief, the default rate in such lawsuits may be as high as ninety percent.

31.    The default rate is so high in the collection actions because Cavalry serves the consumer with a complaint and affidavit falsely alleging Cavalry's ability to prove the information contained therein.

32.    The purpose of such affidavits is to deceive the consumer into believing that Cavalry can prove the case at trial and to intimidate the consumer into payment.

33.    The collection case affidavits are deceptive because they purport to be based on a review of  "computerized account records" which Calvary "maintains in the routine course of business … with entries made at or very near the time of any such occurrence," and that

Fitzgerald "could testify to the matters set forth herein." *See* Exhibit B, Fitzgerald Affidavit at ¶6.

34.     In truth, the affidavits are created from the one line data file that Cavalry allegedly purchased "as-is."

35.     By submitting such an affidavit to the consumer, while concealing documents in which the alleged account seller effectively disclaims the accuracy of its records and information, Cavalry perpetrates a fraud on the consumer.

36.     Accordingly, the consumer is discouraged from defending the lawsuit or challenging the allegations contained in the complaint and affidavit.

37.     Cavalry actively conceals the nature of its defective standing; an unsophisticated consumer would not know that these "as-is" purchase agreements exist.

38.     An unsophisticated consumer would not be aware of the elements of the business records exception to the rule against hearsay.

39.     When Cavalry files a collection action against a consumer, it  implicitly represents that the allegations and factual contentions contained in the complaint and affidavit are backed by evidentiary support. Federal Rule of Civil Procedure 11(B)(3) states:

> Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> []
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery

Fed R. Civ. Proc. 11(B)(3).

40.     In these *ex parte* collection actions Cavalry does not disclose to the court that it has not conducted a reasonable investigation into its claims or that it would never have presented evidence to support its claims. *See* Comment 14 to Rule 3.3 of the Illinois Rules of Professional conduct, which states: "… in any *ex parte* proceeding … [t]he lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision."

41.     Cavalry does not conduct a reasonable investigation into a debt's existence in the collection actions it files; rather Cavalry intends to obtain a default judgment against the consumer by falsely representing to the consumer and the court, through the filing of its complaint and affidavit, that it has evidence to support the claims stated therein.

42.     In reality, Calvary never intends to proceed to trial; it knows that it cannot prevail at trial.

43.     This practice amounts to an unfair, deceptive and improper use of the court system in connection with the collection of a debt.

44.     A recent supervisory report issued by the Consumer Finance Protection Bureau states that its examiners found that, in 70% of lawsuits filed by a debt buyer, the debt buyer dismissed its case when the consumer filed an answer. Consumer Financial Protection Bureau, *Supervisory Highlights*, Spring 2014, pg. 14, available at: http://files.consumerfinance.gov/f/201405_cfpb_supervisory-highlights-spring-2014.pdf (last visited June 11, 2014).

45.     The report stated, "Despite the entity's express or implied representations to consumers that it intended to establish that consumers owed a debt in the amount claimed in

court filings, in numerous instances, the entity misled consumers because it demonstrably had no such intention." *Id.*

46.     Once the default judgment is entered Cavalry can proceed to garnishment regardless of whether it could have proven its case at trial.

47.     Cavalry routinely voluntarily dismisses cases where the consumer appears before the court to defend the action in order to protect its business model and avoid losing at trial.

### Terry's Defense of the Collection case

48.     On or about November 1, 2013, Terry retained Sulaiman Law Group, Ltd. ("counsel") to defend the collection case, and counsel filed its appearance on or about November 21, 2013.

49.     On February 27, 2014, the collection case was set for trial on May 1, 2014. *See* Exhibit C, a true and correct copy of the February 27, 2014 Order.

50.     The day before trial, Calvary informed counsel that  it would not be proceeding forward at trial.

51.     On May 1, 2014, Calvary voluntarily dismissed its case without prejudice. *See* Exhibit D, a true and correct copy of the May 1, 2014 dismissal order.

52.     It can be reasonably inferred that Cavalry voluntarily dismissed the collection case because Cavalry knew that it could not demonstrate the accuracy of the information contained in its complaint, or that it even owned the FIA account at all.

53.     Even if Cavalry had intended to take the collection case to trial, which it did not, it would have been unable to prevail at trial due to its lack of evidence demonstrating ownership of the FIA account and the accuracy of the information contained in Cavalry's complaint described above.

8

54.     Calvary was aware that it could and would not prove its case at trial when it filed its lawsuit against Terry.

55.     By operation of law, Cavalry has one year or until the statute of limitations expires, whichever is longer, to re-file its case against Terry.

56.     Terry is left to wonder when or if he will be served with another summons containing another deceptive affidavit and baseless complaint.

57.     This uncertainty has caused Terry significant stress and emotional distress.

58.     Terry was harmed by Cavalry's unfair and deceptive practices because he had to spend time and energy defending against Cavalry's frivolous lawsuit.

59.     Terry was further harmed by Cavalry's unfair and deceptive practices, as she incurred costs defending against Cavalry's frivolous lawsuit, including retaining counsel.

## COUNT I - VIOLATION OF FDCPA

60.     Terry repeats and realleges paragraphs 1 through 59 as though fully set forth herein.

61.     The collection case was an attempt to collect a "consumer debt" as defined by the FDCPA, 15 U.S.C. §1692a(5).

62.     Defendant violated 15 U.S.C. §§1692e, e(2), e(5), e(10) and (f) by filing the collection case based on unverified account information.

63.     Defendant violated 15 U.S.C. §1692e and e(10) by using a false, deceptive, or misleading representation or means in connection with the collection of any debt. The filing of the collection case was false and deceptive because Cavalry could not demonstrate ownership the FIA account. As discussed above, the false Fitzgerald affidavit was intended to deceive and intimidate Terry into paying Cavalry on the FIA account by misrepresenting the evidentiary

support for the claims asserted therein, including that Cavalry purchased the FIA account and the balance due.

64.     Cavalry's complaint and the Fitzgerald affidavit are inherently deceptive, false, and misleading because they are based on unverified information that Cavalry allegedly acquired "as-is" (the single-line data file); not the original account records. Yet, the Fitzgerald affidavit falsely represents that Cavalry could prove the claims set forth therein. *See* Exhibit A and Exhibit B.

65.     Defendant violated 15 U.S.C. §1692e(5) by threatening to take action that it did not intend to take when it filled the collection case knowing that it could not prevail at trial, and that it would dismiss its case if challenged. As stated above, Cavalry does not intend to prove its case at trial; rather its business model is to obtain a default judgment or dismiss the action to avoid getting caught and losing at trial.

66.     Defendant violated 15 U.S.C. §1692e(2) by falsely representing the character, amount, and status of the FIA account because Cavalry did not own the FIA account. Even if Cavalry did own the FIA account, it would have no way of determining the amount claimed. Thus, Cavalry's assertions as to its ownership and knowledge of the FIA account information set forth in the Cavalry complaint and Fitzgerald affidavit were false.

67.     Defendant violated 15 U.S.C. §1692(f) by using unfair means to collect or attempt to collect any debt; Cavalry's filing of the collection case, while knowing that it could not prevail at trial, was unfair because Terry had to spend time and money defending against a frivolous lawsuit. Moreover, Cavalry's pattern and practice of filing collection actions against consumers, without conducting a reasonable investigation into its claims or disclosing its lack of evidence,

with the intent of obtaining a default judgment, amounts to an unfair debt collection practice effectuated through the courts. This practice is unfair to the consumer and against public policy.

68.     Calvary was aware at the time that Cavalry allegedly purchased the FIA account that any data they received was being sold "as-is" and that the could not verify the accuracy of the data.

69.     Nevertheless, Cavalry filed the collection case in order to intimidate Terry to pay the money that Calvary alleged was owed.

70.     Cavalry's complaint and the Fitzgerald affidavit represent  material violations of the FDCPA because they effectively deceive consumers into believing that Cavalry can prove ownership of the alleged debt when it cannot.

71.     It is Cavalry's regular business practice to file claims against consumers even though it cannot verify the data in its complaints.

72.     As pled in paragraphs 56 through 59 above, William was harmed by Defendant's unfair and deceptive practices.

73.     William is therefore entitled to an award of statutory damages, actual damages, and legal fees pursuant to 15 U.S.C. §1692k.

WHEREFORE, Plaintiff, TERRANCE L. NEEDHAM, respectfully requests that this Honorable Court enter judgment in her favor as follows:

a.  declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

b.  awarding Plaintiff statutory and actual damages, in an amount to be determined at trial, for the underlying FDCPA violations;

c.  ordering the deletion of all adverse credit reporting related to the alleged debt;

d.  awarding Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. §1692k; and

e. awarding any other relief as this Honorable Court deems just and appropriate.

## COUNT II - VIOLATION OF ILLINOIS CONSUMER
## FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT ("ICFA")

74. Terry restates and realleges paragraphs 1 through 59 as though fully set forth herein.

75. Defendant violated 815 ILCS 505/2 by engaging in an unfair and deceptive act or practice by using fraud, deception, and misrepresentation in their efforts to collect an unverified debt from Terry; Defendant's active participation in the collection case, while knowing that they could not prevail at trial, was intended only to deceive Terry into thinking he would have to pay Cavalry to avoid a judgment against him.

76. Defendant does not conduct a reasonable investigation into a debt's existence in the collection actions Cavalry files; rather it intends to obtain a default judgment against the consumer by representing to the consumer and the court, through the filing of its complaint and affidavit, that Cavalry has evidence to support the claims stated therein.

77. Cavalry's pattern and practice of filing collection actions against consumers, without conducting a reasonable investigation into its claims or disclosing its lack of evidence, with the intent of obtaining a default judgment, amounts to an unfair debt collection practice effectuated through the courts.

78. Calvary's pattern and practice described above amounts to an unfair, deceptive and improper use of the courts in connection with the collection of a debt.

79. The Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA) states:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression

or omission of such material fact … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

80. Terry is a consumer as defined by ICFA, 815 ILCS 505/1(e).

81. Defendant's attempt to collect a debt is part of the conduct of any trade or commerce as defined by ICFA, 815 ILCS 505/1(f).

82. The collection case and the related complaint and Fitzgerald affidavit represent the use of deception, fraud and false pretense in an attempt to collect an unverified debt.

83. Defendant's active concealment of Cavalry's lack of evidence to support its claims represents a material misrepresentation, made in the conduct of trade or commerce.

84. Calvary intended that Terry rely on its misrepresentations and pay Cavalry for the FIA account.

85. Additionally, Cavalry's abusive trial strategy was inherently unfair to Terry— Cavalry represented that it could prove its case at trial, and that it would be able to demonstrate its standing to sue at trial. All the while, Cavalry knew it could not support its case with sufficient evidence and it never intended to go to trial.

86. As a result of this unfair and deceptive conduct, Terry had to hire counsel to defend against a lawsuit that Cavalry had no intention of litigating.

87. ICFA further states:

Any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper.

815 ILCS 505/10a.

88.     Terry was harmed by Defendant's unfair and deceptive practices because he had to spend time and energy defending against Cavalry's frivolous lawsuit.

89.     Terry was further harmed by Defendant's unfair and deceptive practices as he incurred costs by retaining counsel to defend against the frivolous lawsuit.

90.     Terry was also exposed to significant emotional strain as a result of the Defendant's unfair and deceptive business practices.

91.     Moreover, upon information and belief, these unfair and deceptive practices are part of a pattern and practice of behavior in which Defendant routinely engages as part of its business model.

92.     An award of punitive damages is appropriate because Defendant's conduct described above was willful and wanton, and showed a reckless disregard for the protections afforded by ICFA, and Terry's rights thereunder.

93.     As such, Terry is entitled to relief pursuant to 815 ILCS 505/10a.

WHEREFORE, Plaintiff, TERRANCE L. NEEDHAM, respectfully requests that this Honorable Court enter judgment in his favor as follows:

a.  declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

b.  awarding Plaintiff actual damages and punitive damages, in an amount to be determined at trial, for the underlying violations;

c.  ordering the deletion of all adverse credit reporting related to the alleged debt;

d.  awarding the Plaintiff costs and reasonable attorney fees; and

e.  awarding any other relief as this Honorable Court deems just and appropriate.

Dated: June 12,  2014                           Respectfully Submitted,

                                                /s/ Matthew H. Hector
                                                Mathew H. Hector, Esq. ARDC#6283058
                                                Daniel J. McGarry, Esq. ARDC#6309647
                                                Counsel for Plaintiff
                                                Sulaiman Law Group, LTD
                                                900 Jorie Blvd, Ste 150
                                                Oak Brook, IL 60523
                                                Phone (630)575-8181
                                                Fax: (630)575-8188